**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Conservation Law Foundation<br>62 Summer St.<br>Boston, MA 02110 | )<br>)<br>)<br>) | |
| Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | Civil Action No._____ |
| WILBUR ROSS, in his official capacity as<br>Secretary of the Department of Commerce<br>Department of Commerce<br>1401 Constitution Avenue, NW<br>Washington, D.C. 20230 | )<br>)<br>)<br>)<br>)<br>) | |
| CHRIS OLIVER, in his official capacity as<br>Assistant Administrator<br>NOAA Fisheries<br>1315 East-West Highway<br>Silver Spring, MD 20910 | )<br>)<br>)<br>)<br>)<br>) | |
| NATIONAL MARINE FISHERIES SERVICE<br>1315 East-West Highway<br>Silver Spring, MD 20910 | )<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      In this action for declaratory and injunctive relief, Conservation Law Foundation

("CLF" or "Plaintiff") challenges the Secretary of Commerce and the National Marine Fisheries

Service's (collectively, "NMFS" or "Defendants") ongoing authorization and management of the

American lobster fishery and their failure to prevent jeopardy and unlawful takes of endangered

North Atlantic right whales ("right whales") in violation of the Endangered Species Act

("ESA"), Marine Mammal Protection Act ("MMPA"), and Administrative Procedure Act

("APA"). *See* 16 U.S.C. §§ 1531-1544; 16 U.S.C. §§ 1361-1389; 5 U.S.C. §§ 701-706.

2.      Right whales are on the brink of extinction, pushed closer by a rash of recent and unprecedented deaths.  Since April 2017 at least 18 animals (approximately 4 percent of the population), mostly females, have died and so far this year no new calves have been spotted in their calving grounds off the Florida and Georgia coasts.  Scientists now predict that less than 450 right whales remain and, without immediate action, they could be functionally extinct in approximately 20 years.

3.      Entanglement in fishing gear is the single greatest threat to right whale survival and recovery.  In some cases, entangled whales drown immediately from the heavy weight of the gear.  In other cases, the line and its gear are dragged, wrapped around a pectoral fin, the tail, the neck or the mouth, for hundreds or even thousands of miles before the animal either frees itself or slowly succumbs.  Chronic entanglement reduces the animals' ability to feed, migrate, and reproduce - further affecting their existence.  For decades entanglements have increased on an annual basis.  Now, more than 80 percent of all right whales have entanglement scars, nearly 60 percent have been entangled more than once, and entanglements account for 85 percent of right whale deaths.

4.      The American lobster fishery, a fishery NMFS acknowledges seriously injures and kills right whales, is managed cooperatively by the states through the Atlantic States Marine Fisheries Commission (from 0-3 miles from shore) and NMFS (from 3-200 miles from shore in the exclusive economic zone).  NMFS authorizes and manages the fishery in federal waters through the issuance of federal permits.  In the Gulf of Maine, the lobster fishery is the most active fixed-gear fishery and trap/pot gear accounts for 98 percent of all lobster landings.

5.      In its 2014 biological opinion on the effects of the American lobster fishery ("Lobster BiOp") on ESA-listed species, NMFS determined that the lobster fishery alone is

likely to kill or seriously injure 3.25 right whales every year.  Despite that determination, NMFS concluded that the continued operation of the fishery over the next ten years was not likely to jeopardize the continued existence of the species.

6.       The Lobster BiOp violates the ESA and APA in several ways.  First, it improperly limits the scope of its analysis to an arbitrary ten-year timeframe.  Second, it improperly analyzes the likelihood of jeopardy to right whales.  Third, it fails to include the legally required incidental take statement.  Finally, it fails to demonstrate a rational connection between the information it presents and its "no jeopardy" conclusion. *See* 16 U.S.C. § 1536; 5 U.S.C § 706(2).

7.       NMFS's continued authorization and management of the lobster fishery in reliance on the fundamentally flawed Lobster BiOp violates the agency's substantive duty under Section 7 of the ESA to ensure that the actions it authorizes are not likely to jeopardize the continued existence of right whales. 16 U.S.C. § 1536(a)(2).

8.       NMFS's continued authorization and management of the lobster fishery also violates Section 9 of the ESA because NMFS allows the fishery to take endangered species without proper authorization. *Id.* § 1538(a)(1)(B), (g).  Further, NMFS's continued authorization of the fishery violates the MMPA and APA because it arbitrarily and capriciously allows the unauthorized take of right whales without the incidental take authorization that is issued after making the required findings. *Id.* §§ 1371(a), 1372(a), 1387(a), (f); 5 U.S.C. § 706(2).

9.       Each of these actions and omissions fails to comply with the statutory requirements of the ESA and MMPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, in violation of the APA.  These actions and failures to act by the Defendants have harmed Plaintiff's interest in the survival and recovery of right whales.  In addition, the Defendants' actions have harmed the Plaintiff's interests in healthy

3

ecosystems of which right whales are a critical part.  This harm will continue in the absence of action by this Court.

10.    To address these violations, Plaintiff seeks a declaration that the Lobster BiOp is arbitrary, capricious, an abuse of discretion, and not in accordance with the law, and an order setting aside those parts of the BiOp that pertain to right whales.  Plaintiff also seeks a declaration that NMFS's ongoing authorization and management of the American lobster fishery violates the ESA, MMPA, and APA.  Plaintiff seeks an order requiring NMFS to complete a new biological opinion on the American lobster fishery within 60 days and to use its emergency authority to avoid or remediate harm to endangered right whales until such time as the new biological opinion is completed and NMFS has implemented the permanent measures necessary to ensure against jeopardy and minimize incidental take.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(1), which provides that the "district courts shall have jurisdiction . . . to enforce any such provision or regulation" of the ESA.  Jurisdiction is also conferred over this action by 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. §§ 701-706 (judicial review of agency action).

12.    The relief requested may be granted under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief), the Endangered Species Act, 16 U.S.C. § 1540(g) (citizen suit remedies), and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (allowing courts to "hold unlawful and set aside" agency actions).

13.    As required under the ESA, Plaintiff provided a 60-day notice of its intent to sue NMFS on November 29, 2017.  A copy of this letter is appended as Exhibit A; receipt of this

letter is appended as Exhibit B.  NMFS has not remedied the violations described in this 60-day

notice. *See* 16 U.S.C. § 1540(g)(2)(A).

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) & (e),

because Defendants reside or maintain offices in this judicial district and a substantial part of the

events or omissions giving rise to the claims occurred in this district.

## PARTIES

15.     Plaintiff Conservation Law Foundation is a non-profit Massachusetts Corporation

with its principal office at 62 Summer Street, Boston, MA.  Founded in 1966, CLF is a non-

profit, member-supported environmental organization with offices in Massachusetts, Maine,

New Hampshire, Vermont, and Rhode Island.  Members of CLF reside in Massachusetts and

elsewhere in New England and the United States.  CLF advocates use law, science, and

economics to solve the problems threatening New England's natural resources and

communities.  For decades, CLF has worked to promote marine conservation and stewardship,

and to revitalize New England's once-legendary ocean resources.

16.     Plaintiff CLF has a longstanding interest in ensuring the survival of the right

whale species and in protecting New England's oceans, which are an important part of the right

whales' designated critical habitat.  In the 1970s and 1980s, CLF challenged proposed oil and

gas lease sales on the outer continental shelf in part due to potential impacts to endangered right

whales.  In the 1990s, CLF participated as *amicus curiae* in litigation under the ESA concerning

the impacts of commercial fishing gear, including lobster gear, on right whales. *See Strahan v.*

*Coxe*, 939 F. Supp. 963 (D. Mass. 1996), *aff'd in part and vacated in part*, 127 F.3d 155 (1st Cir.

1997), *cert. denied*, 525 U.S. 978 (1998).  Eleanor Dorsey, then-CLF Staff Scientist, served on

the Atlantic Large Whale Take Reduction Team formed in 1996 to develop recommendations for

reducing incidental take of right whales and other large whales in commercial fishing operations.  CLF has previously sued NMFS for violations of the ESA related to right whale entanglements in fishing gear and forced the agency to amend its fisheries management regulations to address threats to right whales. *See Conservation Law Found. v. Evans*, Civil Action No. 00-12069-DPW (D. Mass. 2001).

17.     In addition, Plaintiff CLF has been and continues to be actively engaged in ensuring the successful development and implementation of the Northeast Regional Ocean Plan to help protect right whales.  The Northeast Regional Ocean Plan sets forth a blueprint for efficient and sustainable utilization of the region's coastal and marine resources through long-term planning, improved intergovernmental and interagency coordination, and decision-making based on the best available science and extensive stakeholder engagement.  Continued implementation of the Northeast Regional Ocean Plan ensures that any federal actions in federal ocean waters take into account the best available science and information about right whales and affected stakeholders.

18.     Plaintiff CLF is also directly engaged in protecting right whales from the risks associated with offshore wind development in wind energy areas in federal waters off the coast of New England.  Together with a coalition of advocacy groups, CLF works collaboratively with offshore wind energy developers to establish mutually agreed upon survey, development, and operations protocols to protect right whales and other marine resources.  For instance, in 2014, CLF and a number of other conservation organizations signed a voluntary agreement with Deepwater Wind, LLC that sets forth a suite of mitigation measures to protect right whales during certain site assessment and characterization activities necessary for offshore wind energy development in the Rhode Island/Massachusetts Wind Energy Area.

19.     Plaintiff CLF brings this suit on behalf of itself and its members.  CLF members derive significant scientific, recreational, health, conservation, spiritual, and aesthetic benefits from endangered right whales.  Members are alarmed by the right whales' declining abundance, the troubling number of recent mortalities, the pervasive threats and habitat destruction associated with commercial fishing, and regulators' failure to take effective management action, all of which jeopardize the species' very survival at this point in time.  Their interests in observing, studying, and appreciating right whales and their marine habitat depend upon a viable population of right whales that contribute to healthy, functioning ecosystems.  The work of these members is ongoing, and they have every intention of continuing these activities for the foreseeable future.

20.     For instance, CLF member Nigella Hillgarth resides in Massachusetts, and previously was the CEO and president of the New England Aquarium.  In that capacity, her responsibilities encompassed oversight of the institution's right whale research, which included the maintenance and updating of a catalog containing photographs and information pertaining to every single known right whale.  She became very concerned with the desperate situation of the right whales as she came to know their individual stories – whether they calved, their names, where they migrated, and, tragically, when, where, and how they died, often painfully and over prolonged periods due to entanglements or other human-induced causes.  Ms. Hillgarth has a strong personal and emotional interest in the continued existence of the right whale species.  She stays up-to-date on the status of right whales by regularly and actively monitoring a variety of press resources and social media accounts that focus on the species and provide updates.  She will continue to pursue her appreciation for right whales and her interest in their survival by

actively tracking and reading the most current articles and online postings.  These interests are harmed by Defendants' failure to adequately protect right whales.

21.     Vi Patek is another CLF member whose interests are harmed by the inadequacy of the Lobster BiOp and the actions/inactions of NMFS.  Ms. Patek is a resident of Nahant, Massachusetts.  She has a strong interest in protecting the ocean waters around Nahant, and is currently the president of a non-profit committed to that goal, Nahant S.W.I.M. Inc. (Safer Waters in Massachusetts).  A moving experience with a right whale led to Ms. Patek's particular interest in the well-being and continued vitality of right whales.  In April of 2016, a right whale visited the waters off the coast of Nahant and swam in those waters, visible to spectators including Ms. Patek on the shore, for three days.  Ms. Patek spent hours observing this right whale, which was the first one she had ever seen. The experience of viewing the right whale in such close proximity was highly emotional and personal, and she was thrilled to share it with some of her children and grandchildren.

22.     Ms. Patek is spearheading an initiative through her non-profit to try to make a difference in the future of right whales by generating an educational initiative in her community about their plight, engaging in outreach to make people and other nonprofit organizations aware of the situation, and seeking to identify the particular right whale that visited Nahant and follow its life.  She hopes to see more right whales, or the return of Nahant's previous visiting right whale, and share that experience with her family.  She is saddened to think that her own grandchildren may never be able to share such an experience with their children, and hopes that her work might make a small difference in the future of the right whale population.  Hoping to view right whales and working to educate others about the dire condition of the right whale

population is an ongoing and significant part of Ms. Patek's personal and recreational life, and she is materially harmed by Defendants' failure to sufficiently protect the right whale.

23.     Another CLF member and Massachusetts resident, Robbin Peach, led the Massachusetts Environmental Trust as Executive Director for 18 years.  Under her oversight, the Massachusetts Environmental Trust was particularly focused on supporting efforts to protect the North Atlantic right whale, Massachusetts' state marine mammal.  In that capacity, Ms. Peach oversaw the support of scientists and policy makers who conducted research and worked to create policy to protect the right whale and its habitat.  Ms. Peach also helped launch the Massachusetts Ocean Task Force, which addressed, among other things, concerns relating to right whales' habitat and protection in its analysis of coastal zone management.  As a consultant to the Marine Mammal Commission, Ms. Peach helped the Commission establish the Large Whale Conservation Fund within the National Fish and Wildlife Foundation, which supports efforts to protect and conserve right whales and right whale habitat, as well as that of other large whales.  Ms. Peach also served on the New Bedford Whaling Museum Leadership Council as well as the Administrative Capacity, Infrastructure Development, and Maintenance Working Group for the Stellwagen Bank National Marine Sanctuary in Plymouth, Massachusetts.  Ms. Peach currently consults on climate change resilience issues, including ecosystem-based concerns.  She is acutely aware of the impact that climate change has on right whale habitat and the population.  Ms. Peach's professional experience fighting to protect the right whale has led to her devout personal interest in the survival of the species.  She remains up-to-date on the dire condition of the right whale population.  She is materially harmed by Defendants' failure to sufficiently safeguard the right whales, which imperils Ms. Peach's extensive body of work to ensure the survival of the right whale species.

24.     NMFS's failure to ensure that its continued authorization and management of the American lobster fishery does not jeopardize the continued existence of right whales consistent with the ESA and to prevent unlawful takes consistent with the ESA and MMPA will irreparably harm right whales as well as the interests of CLF and its members.

25.     The injuries to the above-described interests of Plaintiff CLF and its members are actual, concrete injuries that are presently suffered by Plaintiff and directly caused by NMFS's failure to comply with the ESA and MMPA.  An order from this Court requiring NMFS to comply with the procedural and substantive mandates of the ESA would protect Plaintiff's interests in the species and redress Plaintiff's injuries.  Plaintiff has no other adequate remedy at law.

26.     Defendant Wilbur Ross is sued in his official capacity as the Secretary of the U.S. Department of Commerce ("Secretary").  Secretary Ross is the chief officer in charge of the Department of Commerce that has ultimate responsibility for ensuring that the programs and actions and decisions of the Department of Commerce comply with all applicable laws and regulations, including the ESA, MMPA, and APA.

27.     Defendant Chris Oliver is sued in his official capacity as the Assistant Administrator for Fisheries at the National Oceanic and Atmospheric Administration.  As the Assistant Administrator, Mr. Oliver is the highest ranking official responsible for implementing and fulfilling the agency's duties under the ESA and MMPA, as well as ensuring that the officials and employees under his supervision comply with all applicable federal laws, including the ESA, MMPA, and APA.

28.     Defendant National Marine Fisheries Service is a federal agency of the United States government within the U.S. Department of Commerce's National Oceanic and

Atmospheric Administration to which the Secretary of Commerce has delegated authority to

protect and manage the fish, marine mammals, and other marine resources of the United States,

including enforcing and implementing the ESA. NMFS has been delegated authority by the

Secretary of Commerce to implement the ESA for right whales, and is responsible for all

required actions and promulgating related regulations.

## LEGAL BACKGROUND

### The Endangered Species Act

29.      The ESA is a federal statute enacted to conserve endangered and threatened

species and the ecosystems upon which they depend. 16 U.S.C. § 1531(b). The ESA is "the most

comprehensive legislation for the preservation of endangered species ever enacted by any

nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The Supreme Court's review of

the ESA's "language, history, and structure" established "beyond doubt that Congress intended

endangered species to be afforded the highest of priorities." *Id.* at 174. As the Supreme Court

found, "the plain intent of Congress in enacting this statute was to halt and reverse the trend

toward species extinction, whatever the cost." *Id.* at 184.

30.      The ESA affords first priority to the preservation of endangered and threatened

species. The ESA therefore establishes that it is "the policy of Congress that all Federal

departments and agencies shall seek to conserve endangered species and threatened species and

shall utilize their authorities in furtherance of the purposes of this chapter." 16 U.S.C. §

1531(c)(1). The principal duties that the ESA assigns to the Secretary of Commerce for

protecting marine species have been delegated to NMFS. 50 C.F.R. § 222.101(a).

31.      Under the ESA, a species can be listed as "endangered" or "threatened." A

species is "endangered" if it "is in danger of extinction throughout all or a significant portion of

11

its range." 16 U.S.C. § 1532(6).  A species is "threatened" if it "is likely to become an

endangered species within the foreseeable future throughout all or a significant portion of its

range." *Id.* § 1532(20).  Once listed, a species is entitled to a number of protections, including

both prohibitions on harm and affirmative duties to promote the species' conservation and

recovery. *Id.* §§ 1536, 1538.

32.     To prevent extinction, "conserve" and "conservation" are broadly defined to mean

"the use of all methods and procedures which are necessary to bring any endangered species or

threatened species to the point at which the measures provided pursuant to [the ESA] are no

longer necessary." *Id.* § 1532(3).

33.     To recover and forestall the extinction of species, Section 9 of the ESA prohibits

any person from taking an endangered species with only limited exceptions. *Id.* § 1538(a)(1)-(2).

"Person" is broadly defined to include private entities, as well as local, state, and federal

agencies, and any other entity subject to the jurisdiction of the United States. *Id.* § 1532(13).

"Take" is also broadly defined to include harming, harassing, trapping, capturing, wounding, or

killing a protected species directly. *Id.* § 1532(19).  Moreover, the regulations further define

"harm" to mean "an act which indirectly kills or injures wildlife by degrading its habitat

sufficiently to impair essential behavior patterns, including feeding, breeding, and sheltering. 50

C.F.R. § 222.102.  The ESA prohibits the acts of parties directly causing a take as well as the

acts of third parties such as governmental agencies whose acts authorize or otherwise bring about

the taking. 16 U.S.C. § 1538(g).  For federal actions, an incidental take may only occur in

accordance with an incidental take statement contained in a valid biological opinion and subject

to all accompanying terms and conditions. *Id.* § 1536(o)(2); 50 C.F.R. § 402.14(i)(1)(5).

34.     Section 7(a)(1) of the ESA directs the Secretary to review programs administered by him and utilize such programs in furtherance of the purposes of this chapter. 16 U.S.C. § 1536(a)(1).  It further requires that federal agencies shall, in consultation with the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered and threatened species. *Id.* § 1536(a)(1).

35.     Section 7(a)(2) of the ESA requires all federal agencies to "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. *Id.* § 1536(a)(2).

36.     The term "jeopardize the continued existence of" a species means "engag[ing] in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the *survival and recovery* of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (italics added). "Recovery" is defined as "improvement in the status of listed species to the point at which listing is no longer appropriate." *Id.*

37.     To assist federal agencies in complying with the substantive section 7(a)(2) duty to avoid jeopardy or destruction or adverse modification of critical habitat, the ESA establishes an interagency consultation process. 16 U.S.C. § 1536(a)(2).  Under section 7(a)(2), federal agencies must consult with the appropriate expert fish and wildlife agency to determine whether their actions will jeopardize any listed species' continued existence or adversely modify designated critical habitat and, if so, to identify reasonable and prudent alternatives to the proposed action to avoid that result. *Id.* §§ 1536(a)(2), (b)(3)(A); 50 C.F.R. § 402.14.

38.     NMFS is the expert fish and wildlife agency that must be consulted with respect to most anadromous and marine species and the U.S. Fish and Wildlife Service ("FWS") is the expert agency that must be consulted with respect to most terrestrial and freshwater species. *See Final ESA Section 7 Consultation Handbook.*

39.     Under this statutory framework, federal actions that "may affect" a listed species may not proceed unless the agency ensures, through completion of the consultation, that the action is not to cause jeopardy or adverse modification of critical habitat.  An agency is relieved of the obligation to consult only if the action will have "no effect" on listed species or designated critical habitat. 50 C.F.R. § 402.14(b)

40.     The expert agencies have adopted joint regulations governing the section 7(a)(2) consultation process.  Under the joint regulations, a federal agency must initiate a section 7(a)(2) consultation with NMFS or FWS ("the Service") whenever it undertakes an "action" that "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a).  Here, this means that NMFS's Sustainable Fisheries Division, which authorizes the operation of the American lobster fishery in federal waters, must consult with the NMFS Protected Resources Division if the fishery "may affect" any listed species.  When consulting on whether an agency action is likely to jeopardize the continued existence of any endangered species, the agencies must "use the best scientific and commercial data available." 16 U.S.C.S. § 1536(a)(2); 50 C.F.R. § 402.14(a).

41.     The threshold for a "may affect" determination and the required ESA section 7(a)(2) consultation is low. *See* 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) ("Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement."). *See also* Endangered Species Act section 7 Consultation Handbook

at 3-13, 4-26.  Under the regulations, the consultation must conclude within 90 days, unless

extended under limited circumstances. 50 C.F.R. § 402.14(e).

42.     The consultation process culminates in the preparation of a biological opinion by

the consulting branch (NMFS Protected Resources Division) that determines whether the federal

action subject to consultation will jeopardize the survival and recovery or adversely modify the

critical habitat of any ESA-listed species. 16 U.S.C. § 1536(b)(3).  The biological opinion must

be issued within 45 days after concluding the consultation. 50 C.F.R. § 402.14(e).

43.     The biological opinion must summarize the information upon which the opinion

is based, including an evaluation of "the current status of the listed species or critical habitat,"

the "effects of the action," and "cumulative effects." *Id.* § 402.14(g)(2)-(3).

44.     Identifying likely "effects" of an action through the consultation process is

integral to ensuring no jeopardy.  The "effects of the action" include both direct and indirect

effects of an action "that will be added to the environmental baseline." *Id.* § 402.02. The

"environmental baseline" includes "the past and present impacts of all Federal, State or private

actions and other human activities in the action area," and "the anticipated impacts of all

proposed Federal projects in the action area that have already undergone formal or early section

7 consultation, and the impact of State or private actions which are contemporaneous with the

consultation in process." *Id.*  "Cumulative effects" include "future State or private activities, not

involving Federal activities, that are reasonably certain to occur within the action area." *Id.*

45.     NMFS must therefore consider not just the proportional share of responsibility for

impacts to the species traceable to the particular activity that is the subject of the biological

opinion, but also the effects of that action when added to all other activities and influences in the

action area that affect the status of that species.  Once NMFS has added the direct and indirect

effects of the action to the environmental baseline and cumulative effects, it must determine

"whether the action is likely to jeopardize the continued existence of a listed species." 16 U.S.C.

§ 1536(b)(3), (b)(4); 50 C.F.R. § 402.14(h)(3).

46.     NMFS must base its determination of whether an activity is likely to jeopardize

the continued existence of a species solely on "the best scientific and commercial data

available." 16 U.S.C. § 1536(a)(2).  The ESA does not permit the agency to base its jeopardy

determination on other factors, such as the cost of protecting the species.

47.     If NMFS concludes in a biological opinion that the action **is not** likely to

jeopardize the continued existence of a listed species but that incidental take of an endangered or

threatened species will occur, the biological opinion must include an incidental take statement

which specifies the impact of any allowable takes of individual members of the species, provides

reasonable and prudent measures necessary to minimize the impact of those takes, and sets forth

terms and conditions that must be followed to insure against jeopardy. *Id.* § 1536(b)(4); 50

C.F.R. § 402.14(1), (3).  Where possible, incidental take must be specified in terms of a

numerical limitation. H.R. Rep. No. 97-567, at 27 (1982), reprinted in 1982 U.S.C.C.A.N. 2807,

2827.

48.     In the case of an endangered or threatened marine mammal, incidental take under

the ESA may only be authorized by NMFS if the taking also complies with the MMPA. 16

U.S.C. § 1536(b)(4)(C).  Take of an endangered species is not prohibited where it complies with

the terms of a valid incidental take statement. *Id.* § 1536(b)(4), (o)(2); 50 C.F.R. § 402.14(i)(5).

49.     If, however, NMFS determines that the action **is** likely to jeopardize the continued

existence of a listed species, the biological opinion must specify any "reasonable and prudent

alternatives" the agency action could implement to avoid jeopardy, or specify that there is no

reasonable and prudent alternative. 16 U.S.C. § 1536(b)(4)(A); 50 C.F.R. § 402.14(h)(3).

Independent of the biological opinion, and even after the consultation process is complete and an

action agency receives a biological opinion, a federal agency undertaking a federal action has a

continuing obligation to ensure that its action "is not likely to jeopardize the continued existence

of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2).  Regardless of the

status of a consultation, this substantive duty to avoid jeopardy to listed species and/or adverse

modification of their critical habitat remains in effect at all times.  An agency may not rely on an

inadequate, incomplete, or flawed biological opinion to satisfy its duty to avoid jeopardy. *See*

*Mayo v. Jarvis,* 177 F. Supp. 3d 91, 146 (D.D.C. 2016).

      50.     In addition, an agency must reinitiate consultation if, among other reasons, "new

information reveals effects of the action that may affect listed species or critical habitat in a

manner or to an extent not previously considered." 50 C.F.R. § 402.16.

      51.     The ESA grants the right to any person to bring suit "to enjoin any person,

including the United States and any other governmental instrumentality or agency . . . who is

alleged to be in violation of any provision of [the ESA] or regulation issued under the authority

thereof." *Id.* § 1540(g)(1)(A).  Under this citizen suit provision, the district courts have

jurisdiction "to enforce any such provision or regulation, or to order the Secretary to perform

such act or duty, as the case may be." *Id.* § 1540(g)(1)(C).

**The Marine Mammal Protection Act**

      52.     In passing the Marine Mammal Protection Act (1972), Congress' overriding

purpose was the protection of all marine mammals, including those endangered or threatened

under the ESA, to the greatest extent feasible. 16 U.S.C. § 1361(1).  The fundamental objectives

of the MMPA are (1) to maintain marine mammal stocks at their "optimum sustainable

population" levels (the "number of animals which will result in the maximum productivity of the

population or the species, keeping in mind the carrying capacity of the habitat and the health of

the ecosystem of which they form a constituent element") and (2) to maintain marine mammal

stocks as functioning elements of their ecosystems. *Id.* §§ 1361(2), 1362(9).

53.     To achieve these objectives, the MMPA imposes a moratorium on takes of marine

mammals, *id.* § 1371(a), and expressly prohibits the unauthorized take of a marine mammal by

any person, *id.* § 1372(a).  Prohibited takings include actions that kill or injure marine mammals

or disrupt behavioral patterns, such as migration, breathing, breeding, or feeding. *Id.* § 1362(13),

(18).

54.     The MMPA also requires the management agencies (NMFS and FWS) to identify

"depleted" species and prepare conservation plans. 16 U.S.C. § 1362(1).  Specifically, it requires

NMFS to "prevent the depletion" of marine mammals from incidental take by commercial

fisheries. *Id.* § 1387(f)(1).

55.     To comply with the MMPA, NMFS must publish a list of commercial fisheries

annually and classify those fisheries based on their risk of interactions with marine mammals. *Id.*

§ 1387(c)(1).  Category I fisheries are defined as those that cause "frequent mortality and serious

injury of marine mammals;" Category II fisheries cause "occasional incidental mortality and

serious injury of marine mammals;" and Category III fisheries have "a remote likelihood of or no

known incidental mortality or serious injury of marine mammals." *Id.*  The Northeast/Mid-

Atlantic American lobster trap/pot fishery is a Category I fishery because it is known to kill or

seriously injure right whales, humpback whales, and Minke whales.

56.     The prohibition on taking a marine mammal is not absolute.  Sections 101 and

118 of the MMPA allow NMFS to issue a permit and authorize the take of a marine mammal

under specific and limited circumstances, including activities such as commercial fishing operations, after it makes certain findings including a negligible impact finding. *Id.* at §§ 1371(a)(2), (a)(5)(E) (authorizing an activity for a three-year period provided it finds, after notice and comment, that the taking will have a negligible impact on the species or stock), 1387(a)(2).

57. A "negligible impact" finding occurs when "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." 50 C.F.R. § 216.103. Once NMFS finds that a commercial fishery will have no more than a "negligible impact" on listed marine mammals (and that other requirements of Section 101(a)(5)(E)(i) have been met), it can authorize incidental take by a fishery and authorize vessels operating in the fishery via federal permits. 16 U.S.C. § 1371(a)(5)(E)(ii). Any permit authorizing incidental take must specify the number and kind of animals authorized to be taken, the location and manner in which they may be taken, the period during which the permit is valid, and any other appropriate terms or conditions. *Id.* § 1374(b)(2)(A)-(D).

58. The MMPA also requires NMFS to prepare a "stock assessment" for each population of marine mammals in U.S. waters, documenting its abundance and trends, describing the fisheries it interacts with, and estimating the level of "mortality and serious injury" caused by those fisheries each year. *Id.* § 1386(a). "Serious injury" is defined as "any injury that will likely result in mortality." 50 C.F.R. § 216.3.

59. Based on the information in the stock assessment, NMFS must estimate the "potential biological removal" level for each stock. 16 U.S.C. § 1386(a). The potential

biological removal level is the maximum number of non-natural animal mortalities that still allow the stock to reach or maintain its optimum sustainable population. *Id.* § 1362(20).

60.     If NMFS determines, during the course of the commercial fishing season, that the incidental take authorized "has resulted or is likely to result in an impact that is more than negligible" on the listed species or stock, it "shall use the emergency authority granted under Section 1387 of this title to protect such species or stock, and may modify any permit granted . . . as necessary." *Id.* § 1371(a)(5)(E)(iii).  In addition, NMFS may suspend or revoke a permit if it determines the permittee is not in compliance with the conditions or limitations of its permit. *Id.* § 1371(a)(5)(E)(iv).

61.     NMFS is required under Section 118 of the Act, which governs incidental take in commercial fishing operations, to develop a "take reduction plan" for each "strategic stock" of marine mammals, including any ESA-listed species. *Id.* §§ 1387(f)(2), 1362(19)(c).  Take reduction plans must reduce fishery-related mortality and serious injury to below potential biological removal within six months of the plan's implementation. *Id.* § 1387(f)(4), (f)(5).

62.     NMFS must amend take reduction plans as necessary to meet requirements of the MMPA, *id.* § 1387(f)(7)(F), and specifically it must "prescribe emergency regulations that, consistent with such plan to the maximum extent practicable, reduce incidental mortality and serious injury in the fishery" when it finds that incidental mortality and serious injury of a marine mammal is having or likely to have an immediate and significant adverse impact on a stock or species.  NMFS must also approve and implement, on an expedited basis, any amendments to the take reduction plan recommended by the take reduction team to address the adverse impacts. *Id.* § 1387(g)(1).

**The Administrative Procedure Act**

63.     The Administrative Procedure Act, 5 U.S.C. § 551 *et seq*., provides that "[a]

person suffering legal wrong because of an agency action, or adversely affected or aggrieved by

agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5

U.S.C. § 702.

64.     In an APA suit, the reviewing court shall "hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." *Id.* § 706(2)(A).

## FACTUAL BACKGROUND

**The North Atlantic Right Whale**

65.     As one of the world's most endangered whales, the North Atlantic right whale has

been listed pursuant to the ESA since its inception in 1973. 16 U.S.C. § 1533.

66.     Right whales are long-lived (can live at least 70 years) and highly mobile.  This

copepod-dependent whale population typically congregates in the Northeast in the Great South

Channel, northern edge of Georges Bank, Massachusetts Bay and Eastern Cape Cod Bay, the

Bay of Fundy, and the southeastern Scotian Shelf to feed on dense aggregations of copepods,

before migrating to Georgia and Florida to calve in the winter.  More recently, a continuous

presence of right whales has been documented in the central Gulf of Maine in Jordan Basin,

Jeffreys and Cashes Ledges, and Stellwagen Bank.  Telemetry data also shows that right whales

occasionally move into deep water off the continental shelf during the summer foraging period.

67.     Critical habitat was first designated in Cape Cod Bay and the Great South

Channel in 1994 due to their importance as spring and summer foraging grounds. *See* 59 Fed.

Reg. 28,805 (June 3, 1994) (also designating nearshore waters off Georgia and Florida as critical

habitat due to their importance as winter calving and nursery grounds).  In 2016, NMFS

expanded the right whale critical habitat designation to include approximately 29,763 square

nautical miles of marine habitat in the Gulf of Maine, Georges Bank, and along the Southeast

coast. *See* 81 Fed. Reg. 4837 (Jan. 27, 2016); 50 C.F.R. § 226.203.  Right whale habitat is

threatened by oil and gas development, noise pollution, dredging, climate change, and

contaminants among other things.

68.     NMFS concluded long before recent events that the loss or decrease in

reproductive capacity of a single individual is likely to "contribute to the extinction of the

species." 69 Fed. Reg. 30,857, 30,858 (June 1, 2004). In this context, any additional right whale

deaths, particularly a reproductive age female, could jeopardize their continued existence.

69.     Females typically reach sexually maturity at nine or ten years of age and give

birth to a single calf.  Although right whales previously gave birth every 3-5 years (estimated

using data from 2005-2014), more recently the average calving interval has extended to

approximately 10 years (2017), due primarily to chronic entanglement in fishing gear.

70.     Right whales are photo-identified, catalogued and identified by scientists and

other observers by the roughened and raised patches of skin on their heads, known as callosities,

which are visible from a distance by observers in boats or planes (aerial surveys).

71.     NMFS has long admitted that entanglement in fishing gear adversely affects and

causes takes of right whales.  In particular, the agency has identified trap/pot gear, which is used

to catch lobster, as the gear type that cause serious injuries and mortalities of right whales due to

entanglement in lines used to connect the fixed fishing gear on the ocean floor to each other and

to the surface buoy.

72.     Pursuant to the MMPA, NMFS undertook development of a Take Reduction Plan for endangered large whales in the Atlantic, including right whales, more than 20 years ago. *See* 62 Fed. Reg. 39,157 (July 22, 1997); *see also* 50 C.F.R. § 229.32.  The Atlantic Large Whale Take Reduction Plan ("ALWTRP") specifies requirements for certain commercial fishing gear that apply to all U.S. waters in the Atlantic, except for those waters expressly exempted. *Id.* §§ 229.32, 217.12.

73.     The American lobster fishery, like all Category I fisheries, is subject to the ALWTRP. *See* 82 Fed. Reg. 3,655 (Jan.12, 2017) (2017 List of Fisheries).  For a vessel owner or crew member to lawfully take a marine mammal in a Category I or II fishery, the owner or representative must be authorized under the MMPA. 16 U.S.C. § 1387(c)(2); 50 C.F.R. § 229.4.

74.     Despite measures in the ALWTRP, the rate of fishing related entanglements and mortalities of right whales has not been reduced.  In 2007 NMFS required the use of sinking groundline by fixed gear fisheries, 72 Fed. Reg. 57,104 (Oct. 5, 2007), however entanglements continued to occur.  NMFS later amended the ALWTRP to specify requirements for trap/pot gear designed to reduce the number of vertical lines in the water column and expand gear marking requirements. 79 Fed. Reg. 36,586 (June 27, 2014).

75.     NMFS has also taken action to reduce the threat of ship strikes to right whales.  In 2008, the agency implemented a provisional "ship speed rule" requiring vessels 65-feet long or longer to reduce speed to 10 knots or less inside seasonal management areas. 73 Fed. Reg. 60,173 (Oct. 10, 2008); 50 C.F.R. § 224.105.  Concurrently, the agency developed a voluntary "dynamic management area program" to encourage ship speed reductions when three or more right whales are sighted in a specific area. 73 Fed. Reg. at 60,180.  In 2013, NMFS indefinitely

extended the ship speed rule. 78 Fed. Reg. 73,726 (Dec. 9, 2013).  Many of the vessels in the

offshore lobster fishery are greater than 65 feet.

76.     Entanglement of right whales has continued despite efforts to mitigate the impact

of commercial fisheries, and accounts for 85 percent of all diagnosed deaths.  Scientists estimate

that 83 percent of all right whales have entanglement scars (1980-2009), 59 percent have been

entangled more than once, and at least one whale has shown evidence of seven entanglements.

77.     According to the most recent stock assessment (2016), between 2010 and 2014,

there were 24 confirmed serious injuries or mortalities that involved entanglements.  The stock

assessment emphasizes that these confirmed numbers underestimate the actual numbers.

78.     The 2016 stock assessment concludes that between 2010 and 2014 there was a

minimum average rate of human-caused right whale mortality of 5.66 whales per year of which

commercial fisheries were responsible for the deaths of 4.65 whales per year (ship strikes

accounted for the rest).  During this same time period, the Potential Biological Removal (the

maximum number of whales that could be removed and still allow the population to reach its

optimum sustainable population) for right whales was 1 whale per year.

79.     Since 2014 (the last year of data used in the most recent stock assessment),

entanglements have not abated.  NMFS has confirmed that entanglements of right whales in

commercial fishing gear, in U.S. and neighboring Canadian waters, include at least 4 in 2015, 7

in 2016, and 9 in 2017.  Not all of these may have caused serious injury or mortality, but even if

they did not, the effects of chronic entanglement are known to negatively impact right whales.

80.     In addition to deaths and serious injuries, recent research shows that chronic

entanglement in fishing gear causes extreme stress, pain, and suffering for right whales and can

interfere with behaviors such as foraging and locomotion.  The substantial energy requirements

associated with chronic entanglement reduce survivorship by at least 20 percent and are linked to decreased reproductive success, declining health, and increased stress hormones which contributes to increased infections and susceptibility to disease.

81.     New scientific studies demonstrate that the right whale population started to decline in 2010, and the steepest drop is among females.

82.     Threats due to entanglements have increased in part because the strength of the lines and the weight of the gear used by the American lobster fishery have increased since the 1990s and right whales are unlikely to break free.  In addition, the number of lobster traps licensed has increased dramatically.  For example, in the Gulf of Maine the number of lobster traps licensed increased from approximately 2.3 million traps in 1993 to more than 3.2 million traps in 2013.  Entanglements have been documented in all parts of the fixed gear fishing industry (including inshore and offshore gear) and by lines throughout the water column – vertical lines and ground lines, and floating and sinking lines.

83.     In 2017, an unprecedented number of mortalities caused the loss of nearly 4 percent of the right whale population – at least 17 new right whale deaths occurred in the U.S. and neighboring Canadian waters, including 5 in waters off the coast of Massachusetts within the past year.  Necropsies show that 2 of these deaths were definitively due to entanglements, and another 9 were documented as "unknown."

84.     The first recorded death in 2018 was a 10-year old female of reproductive age found entangled in fishing line and floating dead off Virginia Beach on January 23rd.

85.      In addition, only 5 calves were born in 2017.  No new calves have been spotted as of the date of filing this complaint in the coastal waters off Florida and Georgia (historic calving grounds) in 2018.

86.     Compounding the declining calving rates is the fact that the right whale population has an uneven sex ratio with many more males than females and of the approximately 185 females that remain, less than 100 are likely to give birth.

87.     In short, the right whale species is far from recovering – it is rapidly headed toward extinction.   The population has been declining in numbers since 2010, there has been a steady decline in the health of the remaining right whales for the last 30 years, there has been a 40 percent decline in reproductive output, and the total population is estimated to be no more than 450 animals.  Scientists predict that if current trends continue, the species could be functionally extinct in approximately 20 years.

**The American Lobster Fishery**

88.     The American lobster fishery is managed under Amendment 3 to the Interstate Fishery Management Plan and its Addenda (I - XXIV).  NMFS authorizes and manages the fishery through regulations implementing management measures in federal waters and the granting of federal permits to all commercial fishermen harvesting lobster in federal waters, with limited exceptions, under the Atlantic Coast Fisheries Cooperative Management Act. *See* 16 U.S.C. §§ 5101-5108; 50 C.F.R. § 697 Subpart A & B. 50 C.F.R. §§ 697.3, 697.4, 697.19. NMFS also manages and authorizes the American lobster fishery through the MMPA. 16 U.S.C. § 1387(c) (registration and authorization); 50 C.F.R. §§ 229.4, 229.32.

89.     Lobster Management Areas span from Maine to North Carolina, but the primary area of harvest is the Gulf of Maine.

90.     The American lobster fishery is the most active fixed-gear fishery in the region and although multiple gear types are used, trap/pot gear accounts for 98 percent of landings (1981 and 2007).  This gear consists of one or more baited traps, buoy-surface lines, groundlines,

and buoys.  The buoy lines connect the trap(s) on the sea floor to buoys on the surface and rise vertically through the water column.  In some cases, each trap has its own buoy line, but in other instances two or more traps are fished in a trawl.  On the sea floor, multiple traps are linked together by groundlines.

91.    Total landings in the American lobster fishery have steadily increased in the past 35 years.  Although landings were fairly stable from 1950 to1975 at approximately 30 million pounds, the average coastwide landings tripled between 1976 and 2008 and they have continued to increase, exceeding 158 million pounds in 2016.  The vast majority of lobster is landed in the state of Maine during the summer and fall months.  Today, the ex-vessel value of the American lobster fishery is estimated at roughly $666,700,000 dollars and represents one of the largest fisheries along the Atlantic coast.

92.    Catch reporting in the American lobster fishery has been inadequate for decades. Currently, in Maine where 83 percent of the total catch is landed, less than 10 percent of the current permit holders report their landings and none of them report where their gear is located with specificity.  This data gap makes it impossible to ascertain how much lobster pot/trap gear is in the water.

93.    Right whales frequent areas where the American lobster fishery operates in large numbers during specific seasons, and they are present in the Gulf of Maine year round.

94.    Formal consultation on the American lobster fishery was first initiated in 1988. This consultation concluded that the lobster fishery may adversely affect but was not likely to jeopardize the continued existence of any listed species in a biological opinion issued by NMFS on March 23, 1994.  Right whale deaths in 1996 prompted reinitiation of consultation and a biological opinion dated December 13, 1996 that concluded the lobster trap fishery was likely to

jeopardize the continued existence of right whales. Since then, there have been numerous formal consultations on the American lobster fishery (finding both jeopardy and no jeopardy), some of which have been challenged in court. *See Humane Society of the U.S. v. NMFS*, Case No. 1:11-cv-11927 (D. Mass., filed Oct. 31, 2011).

**The 2014 American Lobster Fishery Biological Opinion**

95.　　On June 6, 2014, NMFS reinitiated formal intra-service consultation "on the continued operation of the American lobster fishery, in accordance with section 7(a)(2) of the ESA and 50 CFR 402.16 given new information presented in the marine mammal stock assessment reports" and new measures that modified the ALWTRP.

96.　　On July 31, 2014, NMFS completed its current biological opinion regarding the effects of the American lobster fishery on ESA-listed species. *See* ESA Section 7 Consultation on Continued Implementation of American Lobster Fishery. The management measures recommended by this biological opinion are contained in the current regulations that manage and authorize the American lobster fishery.

97.　　NMFS limits the scope of the Lobster BiOp to 10 years citing a variety of factors including potential changes in the lobster fishery (and an expectation that fishing effort would decrease), habitat concerns, status of the lobster resource, and data limitations that made it difficult to predict effects beyond 10 years. Rather than consider and analyze the "longer-term effects of the fishery on ESA-listed species," such as right whales, the agency merely states that the effects are "difficult to pinpoint and extrapolate beyond ten years." Lobster BiOp at 8.

98.　　The action area is defined in the Lobster BiOp as "the area in which the American lobster fishery operates, broadly defined as all EEZ [exclusive economic zone] waters from Maine through Cape Hatteras, NC, and the adjoining state waters that are affected through the

regulation of activities of federal American lobster permit holders fishing in those waters."
Lobster BiOp at 23.

99.     The Lobster BiOp concludes that from 2007-2011, the annual human-caused
mortality and serious injury rate for right whales averaged 4.74 per year (average number of
entanglements is 3.25 per year/ average number of ship strikes is 0.8 per year).  NMFS cautions
that even these numbers are underestimates of injury and mortality because: (1) entanglements
frequently go unobserved entirely; (2) the gear type, fishery, and/or country of origin for
observed entanglement events are often not traceable; and (3) weather and other factors often
prevent the detection and examination of carcasses.   Even when disentanglement is successful,
the entanglement may weaken or compromise the individual so significantly that subsequent
death from ship strikes, starvation, infection, or disease is more likely.

100.     The Lobster BiOp concludes that despite new measures implemented under
through the ALWTRP for trap/pot gear, right whale entanglements in lobster gear are expected
to continue and estimates that the ongoing operation of the fishery will kill or seriously injure up
to 3.25 right whales per year, or 32.5 animals in the 10-year time period analyzed.

101.     The environmental baseline and cumulative effects analysis in the Lobster BiOp
discuss the increasing effects of ship strikes due to increased commercial traffic and recreational
activities; noise pollution due to increases in shipping, seismic exploration, offshore drilling, and
sonar; military vessel activities and operations; ingested plastics; pollution; global climate
change; contaminants; and catastrophic oil spills.  The cumulative effects analysis concludes that
the combination of these effects may negatively influence the recovery of ESA-listed species,
including right whales.

102.     The Lobster BiOp reiterates the 2005 revised Recovery Plan's conclusion that "the most significant need" for recovery of right whales is to reduce deaths and injuries from anthropogenic causes, including those caused by the operation of commercial fishing operations. Lobster BiOp at 147.  The Lobster BiOp determines that the potential biological removal for right whales is 0.9.

103.     The Lobster BiOp assumes the American lobster fishery will reduce effort in the succeeding years (which did not occur) in reaching the conclusion that entanglements in the American lobster fishery are unlikely to increase above 3.25 per year.

104.     The Lobster BiOp concludes that the American lobster fishery is not threatening the survival of right whales based on the 2013 stock assessment's (incorrect) conclusion that the right whale population was increasing.

105.     The Lobster BiOp concludes that the continued authorization of the American lobster fishery is "not likely to jeopardize the continued existence of" right whales. Lobster BiOp at 133.

106.     NMFS's no jeopardy conclusion is based solely on whether 3.25 deaths and serious injuries to right whales will reduce the survival and recovery of right whales.

107.     The Lobster BiOp analysis does not consider the best available science regarding the effects of chronic entanglements and the likelihood such entanglements will appreciably reduce the survival and recovery of the species due to the increased chance that a debilitated right whale will be struck by a vessel, and the stress hormones released that cause decreased reproductive success, and increased susceptibility to disease.

108.     NMFS's jeopardy analysis does not consider the full impact of the American lobster fishery on right whales because it fails to add the direct and indirect effects of the fishery

to the environmental baseline analysis and the cumulative effects on the species consistent with 50 C.F.R. § 402.02.

109.     The Lobster BiOp does not include an incidental take statement that authorizes right whales to be taken in the American lobster fishery, despite the fact that the biological opinion admits and assumes that takes will occur.

110.     The Lobster BiOp includes numerical reinitiation triggers for right whales that, if exceeded, or it is statistically impossible not to exceed them, requires NMFS to reinitiate consultation.  These triggers include: (a) the annual average serious injury and mortality rate for right whales is greater than 3.25 whales at the conclusion of a 5-year period; or (b) at any time during the 5-year period, the number of right whale serious injuries and mortalities make it statistically impossible for the average to be less than 3.25 whales at the end of the 5-year period.

111.     On October 17, 2017, NMFS reinitiated consultation on the American lobster fishery based on recent deaths and new scientific information demonstrating that the right whale population has been declining since 2010.

112.     NMFS has not completed this new consultation and has announced that the timeline will be extended (beyond the normal regulatory timeframe of 145 days) without providing an estimated date of completion.

113.     NMFS continues to rely on the inadequate 2014 Lobster BiOp to authorize and manage the American lobster fishery.

**Lack of MMPA Authorization**

114.     NMFS has not made the required MMPA Section 101(a)(5) findings, including that takes of right whales by the lobster fishery will have no more than a "negligible impact" on the species, necessary to authorize incidental take in the American lobster fishery.

115.    The Lobster BiOp admits that incidental take of right whales by the American

lobster fishery has not been authorized under section 101(a)(5) of the MMPA. Lobster BiOp at

161.

116.    NMFS has not issued emergency regulations to reduce the incidental mortality

and serious injury of right whales in the lobster fishery despite the fact that documented right

whale deaths from commercial fisheries in 2017 was several times higher than the even the 3.25

whales deaths per year estimated as allowable under the (incorrect) survival and recovery criteria

in NMFS's most recent stock assessment.  The 17 right whale deaths in 2017 (2 confirmed as

entanglements in commercial fishing gear and another 9 listed as unknown) are having an

immediate and significant adverse impact on right whales.

117.    NMFS has also not proposed amendments to the ALWTRP to reduce the risks to

right whales since 2014, 79 Fed. Reg. 36,586 (June 27, 2014), although scientists and the public

have recommended measures such as gear reduction, additional gear markings, breakaway links

at the base of surface buoys, the use of whale release rope, mandatory reporting and monitoring,

additional area closures, and further vessel speed limits in the face of recent deaths.

**CLAIMS FOR RELIEF**

**Count I – NMFS's Lobster BiOp Is Arbitrary, Capricious, an Abuse of Discretion, and Not in Accordance With the ESA**

118.    Paragraphs 1 through 117 are hereby realleged as though set out in full.

119.    Section 7(a)(2) of the ESA requires each federal agency, "in consultation with and

with the assistance of the Secretary," to "insure that any action . . . is not likely to jeopardize the

continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2).

In making a jeopardy determination, NMFS must formulate its biological opinion as to whether

the direct and indirect effects of the action, added to the environmental baseline and cumulative

effects on the species, is likely to jeopardize the continued existence of right whales. *Id.* §

1536(b)(3), (b)(4); 50 C.F.R. § 402.14(g)(2)-(3).  "Effects of the action" include both direct and

indirect effects of an action" "that will be added to the "environmental baseline." *Id.* § 402.02.

The agency's analysis must be based on the best scientific and commercial data available. 16

U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02, 402.14(g).

120.    A biological opinion must include an incidental take statement for any take of an

affected species that may occur from the action. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g), (i).

The incidental take statement must specify the impact (i.e. the amount of extent) of the action's

incidental take on the affected species, reasonable and prudent measures necessary or appropriate

to minimize the impact of that take, and terms and conditions with which the action agency must

comply to implement the measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g), (i).

121.    NMFS's Lobster BiOp is a final agency action as defined by the APA.

122.    The Lobster BiOp improperly and artificially limits the scope of its analysis to 10

years despite the fact that the natural life span of right whales is over 70 years and they will be

affected by the fishery well beyond the 10 years.  The Lobster BiOp acknowledges that its 10-

year timeframe is arbitrary and is not based on factors such as right whale biology.  Thus, the

Lobster BiOp does not analyze the full effects of the entire agency action.

123.    NMFS's Lobster BiOp jeopardy analysis is insufficient for several reasons,

including the following:

(a) the analysis only considers the effects to right whales from death or serious injury and

fails to consider other impacts caused by chronic entanglements such as decreased

survival, decreased reproductive success, and increased susceptibility to infections and

disease;

(b) the analysis does not add the direct and indirect effects of NMFS's ongoing

authorization and management of the American lobster fishery to the environmental

baseline and cumulative effects on the species, as required by ESA Section 7(a)(2), 16

U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02; and

(c)  the analysis improperly bases its no jeopardy determination on an analysis of whether

the American lobster fishery will affect right whales' trend towards recovery or

reclassification (as a "threatened" species), rather than on whether the fishery would

reasonably be expected to appreciably reduce the likelihood of both survival and recovery

of right whales by reducing the reproduction, population, or distribution of the species.

124.    Despite finding that the American lobster fishery will seriously injure or kill right

whales, NMFS's Lobster BiOp fails to include an incidental take statement that would account

for, minimize, require the reporting of, and authorize take of right whales in accordance with the

ESA.  Further, NMFS cannot rely on the reinitiation triggers as a substitute for the criteria and

substantive requirements of an incidental take statement.

125.    NMFS's Lobster BiOp is arbitrary, capricious, an abuse of discretion, and not in

accordance with Section 7 of the ESA, in violation of the APA. 5 U.S.C. § 706(2)(A); *Motor

Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

126.    These actions have harmed CLF and it has no other adequate remedy at law.

**Count II – NMFS's Continued Authorization and Management of the American Lobster
Fishery Violates its Duty to Ensure Its Actions Are Not Likely to Jeopardize Right Whales**

127.    Paragraphs 1 through 126 are hereby realleged as though set out in full.

128.    NMFS has a duty as the action agency authorizing and managing the American

lobster fishery to ensure that its actions are not likely to jeopardize the continued existence of

any ESA-listed species, including right whales. 16 U.S.C. § 1536(a)(2).

129.     NMFS cannot rely on the unlawful Lobster BiOp to meet its duty to ensure that its authorization of the American lobster fishery will not jeopardize right whales.

130.     Even if NMFS could rely on the unlawful Lobster BiOp (which it cannot), NMFS is violating its ESA section 7 duty because the actual impact of the up to 3.25 right whale deaths per year, demonstrably worse given the recent number of deaths, and does not ensure that the American lobster fishery will not jeopardize the continued existence of right whales.

131.     NMFS's continued authorization and management of the American lobster fishery based on the Lobster BiOp is in violation of section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and such reliance on the Lobster BiOp is arbitrary, capricious, an abuse of discretion, and not in accordance with law, contrary to the APA, 5 U.S.C. § 706(2).

132.     These actions have harmed CLF and it has no other adequate remedy at law.

**Count III – NMFS's Authorization and Management of the American Lobster Fishery Allows Unpermitted Takes of Right Whales In Violation Of ESA Section 9**

133.     Paragraphs 1 through 132 are hereby realleged as though set out in full.

134.     Section 9 of the ESA prohibits any person from "taking" an endangered species with only limited exceptions. 16 U.S.C. § 1538(a)(1)-(2).  For federally authorized actions, the take of an affected species may only occur legally if exempted from the ESA's prohibition on take. *Id.* § 1536(o)(2); 50 C.F.R. § 402.14(i)(1)(5).

135.     NMFS's Lobster BiOp admits that the American lobster fishery currently takes right whales, concludes that the lobster fishery will continue to kill or seriously injure up to 3.25 right whales each year, and cautions that the number of takes are likely far greater as these numbers are underestimates for several reasons.  NMFS was able to directly attribute at least one right whale entanglement to U.S. lobster gear in 2016.  Since April 2017, 18 total right whale

35

deaths have been documented in adjoining U.S. and Canadian waters, 3 of which have been

confirmed as entanglement in commercial fishing gear, and another 9 are unknown.

136.     NMFS concluded long before recent events that the loss or decrease in

reproductive capacity of a single individual is likely to "contribute to the extinction of the

species."  69 Fed. Reg. at 30,858.

137.     The Lobster BiOp does not include an incidental take statement authorizing the

take of any right whales in the American lobster fishery.

138.     Every entanglement of right whales by the American lobster fishery is unlawful

and NMFS, as the agency authorizing and managing the American lobster fishery, has

unlawfully taken right whales and continues to cause the unpermitted take of endangered right

whales, in violation of Section 9 of the ESA. 16 U.S.C. § 1538.

139.     These actions have harmed CLF and it has no other adequate remedy at law.

**Count IV – NMFS's Continued Authorization and Management of the American Lobster Fishery Allows Unauthorized Takes of Right Whales in Violation of the MMPA and APA**

140.     Paragraphs 1 through 139 are hereby realleged as though set out in full.

141.     The MMPA includes a moratorium on the taking of marine mammals. 16 U.S.C.

§ 1371(a).  The Act provides for a limited exception to the moratorium allowing incidental takes

in commercial fishing operations provided the Secretary "finds that the total of such taking

during each five-year (or less) period concerned will have a negligible impact on such species or

stock" and if he "prescribes regulations setting forth permissible methods of taking pursuant to

[the] activity and other means of effecting the least practicable adverse impact on such species or

stock." *Id.* § 1371(a)(5)(A)(i), (a)(5)(E).

142.     If during the course of a commercial fishing season the incidental mortality and

serious injury to a marine mammal from commercial fisheries "is having, or is likely to have, an

immediate and significant adverse impact on a stock or species," and there is a take reduction

plan in effect, NMFS is required to: (1) "prescribe emergency regulations that, consistent with

such plan to the maximum extent practicable, reduce incidental mortality and serious injury in

that fishery; and (2) approve and implement on an expedited basis, any amendments to such plan

that are recommended by the take reduction team to address the adverse impact." *Id.* §

1387(5)(g)(1)(A).

143. NMFS's Lobster BiOp admits that the American lobster fishery causes takes of

right whales, and finds that the lobster fishery will kill or seriously injure up to 3.25 right whales

per year. The numbers are likely far greater as the gear is poorly marked and often not retrieved.

NMFS has attributed at least one right whale was entangled in U.S. lobster gear in 2016. Since

April 2017, 18 right whale deaths have been confirmed in adjoining U.S. and Canadian waters, 3

of which have been attributed to entanglement in commercial fishing gear and another 9 deaths

are unconfirmed.

144. NMFS concluded long before recent events that the loss of decrease in

reproductive capacity of a single individual is likely to "contribute to the extinction of the

species." 69 Fed. Reg. at 30,858.

145. NMFS has not made the required "negligible impact" finding for the American

lobster fishery and NMFS admits in the Lobster BiOp that it has not issued an incidental take

authorization for the American lobster fishery consistent with the MMPA.

146. NMFS also has not issued emergency regulations or amendments to the take

reduction plan necessary to protect right whales despite the fact that serious injury and mortality

of right whales from entanglement in commercial fishing gear is now more than four times the

sustainable number identified in the most recent stock assessment and this take is having an immediate and significant adverse impact on right whales.

147.     NMFS continued authorization and management of the American lobster fishery in the absence of the required incidental take authorization and emergency regulations to protect right whales is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the MMPA, in violation of the APA. 5 U.S.C. § 706(2).

148.     These actions have harmed CLF and it has no other adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A.   Declare that NMFS's Lobster BiOp (including its "no jeopardy" finding) is arbitrary, capricious, an abuse of discretion, and not in accordance with the law, in violation of the ESA and APA;

B.   Set aside and vacate all parts of the Lobster BiOp pertaining to right whales;

C.   Declare that NMFS is in violation of its ESA Section 7(a)(2), 16 U.S.C. § 1636(a), duty to ensure that the continued authorization and management of the American lobster fishery is not likely to jeopardize the continued existence of right whales;

D.   Declare that NMFS violated Section 9 of the ESA, and the MMPA by causing unpermitted takes of right whales in the American lobster fishery;

E.   Declare that NMFS's continued authorization of the American lobster fishery without incidental take authorization is arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of Section 9 of the ESA and Sections 101 and 118 of the MMPA, 16 U.S.C. §§ 1371(a)(5)(E), 1387(a)(2) and the APA, 5 U.S.C. § 706(2);

F.   Declare that NMFS's failure to issue emergency regulations necessary to protect right whales is arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of Section 118 of the MMPA, 16 U.S.C. § 1387(g), and APA, 5 U.S.C. § 706(2);

G.   Order NMFS to complete a new  biological opinion for the lobster fishery within 60 days that fully complies with the ESA, MMPA, and all other applicable law;

H.   Order NMFS to use its emergency authority to avoid and reduce incidental mortality and serious injury to right whales to the maximum extent practicable, including through measures such as additional:

- area closures;
- vessel speed limits;
- gear marking requirements;
- vessel and gear monitoring systems; and
- use of whale release rope and ropeless gear;

until such time as NMFS has fully complied with ESA section 7(a)(2), and implemented all permanent measures necessary to ensure the American lobster fishery is not likely to jeopardize the continued existence of right whales;

I.   Order NMFS, until such time as it has fully complied with this Court's order and opinion, to update this Court with status reports every 30 days on its progress toward: (1) avoiding and reducing incidental mortality and serious injury to right whales in the American lobster fishery through the use of emergency regulations; (2) complying with ESA Sections 7(a)(2) and 9, and MMPA Sections 101 and 118, and this Court's opinion and order.

J.   Award Plaintiff its fees, costs, expenses, and disbursements, including reasonable attorney's fees associated with this litigation pursuant to the Endangered Species Act, 16 U.S.C. § 1540(g)(4), and the Equal Access to Justice Act, 28 U.S.C. § 2412; and

K.   Grant such additional relief as Plaintiff may request and the Court deems just

and proper.


Respectfully submitted this 7th day of February, 2018

/s/ Erica A. Fuller
Erica A. Fuller (DC Bar No. MA0001)
Roger Fleming (DC Bar No. ME0001)
Earthjustice
1625 Massachusetts Avenue NW, Suite 702
Washington, DC 20036
Tel.: 202-667-4500
Fax: 202-667-2356
efuller@earthjustice.org
rfleming@earthjustice.org

Emily K. Green (*Pro Hac Vice* pending)
(Maine Bar No. 5095)
Sean Mahoney (*Pro Hac Vice* pending)
(Maine Bar No. 8661)
Conservation Law Foundation
53 Exchange St., Suite 200
Portland, Maine 04101
Tel.: 207-210-6439
Fax: 617-350-4030
egreen@clf.org
smahoney@clf.org

*Counsel for Plaintiff*